3028112-ALF

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| D'KIDS PARTNERS, L.P., individually and on behalf of Kirlins, Inc., DONALD W. KIRLIN, individually and on behalf of Kirlins, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | JURY DEMAND |
| vs. | ) ) | |
| DALE T. KIRLIN, JR., GARY F. KIRLIN, JAMES A. RAPP, SCHMEIDESKAMP, ROBERTSON, NEU & MITCHELL, LLP, and HUTMACHER & RAPP, P.C., | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

D'KIDS PARTNERS, L.P., individually and on behalf of Kirlins, Inc. ("Kirlins" or the

"Company"), and DONALD W. KIRLIN,  individually and on behalf of Kirlins, Inc., for their

Complaint against DALE T. KIRLIN, JR., GARY F. KIRLIN, JAMES A. RAPP,

SCHMEIDESKAMP, ROBERTSON, NEU & MITCHELL, LLP, and HUTMACHER & RAPP,

P.C., states as follows:

## JURISDICTION & VENUE

1.      This action arises under the laws of the United States. This Court has jurisdiction

pursuant to 28 U.S.C.A. §§ 1331, 1337, and 1367.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that a substantial

part of the events or omissions giving rise to these claims occurred within this judicial district.

More specifically, and as described in further detail below, defendants' mismanagement of

Kirlins, Inc. and breaches of fiduciary and professional duties occurred within this judicial district.

## PARTIES

3.      D'Kids Partners, L.P., ("D'Kids") is an Illinois limited partnership formed for the benefit of Donald Kirlin and his family on February 2, 1999 with its primary place of business in the State of Illinois. DK Trust holds the D'Kids interests.

4.      D'Kids owns approximately one third (1/3) of the voting common stock of Kirlins, Inc.

5.      D'Kids brings this Complaint personally in its capacity as a shareholder of Kirlins, Inc., and derivatively on behalf of Kirlins, Inc.

6.      Kirlins, Inc. is an Illinois corporation with its primary place of business in the State of Illinois.

7.      Donald W. Kirlin ("Donald") is an individual and is a citizen of the State of Colorado.

8.      Donald brings this Complaint personally, as a Director of Kirlins, Inc. and derivatively on behalf of Kirlins, Inc.

9.      Donald previously owned approximately one third (1/3) of the voting common stock of Kirlins, before he transferred it to D'Kids.

10.     Dale T. Kirlin ("Dale") is an individual and a citizen of Illinois, and is sued due to his conduct as an Officer and/or Director and shareholder of Kirlins, Inc.

11.     Gary Kirlin ("Gary") is an individual and citizen of Illinois, and is sued due to his conduct as an Officer and/or Director and shareholder of Kirlins, Inc.

12.     James A. Rapp ("Rapp") is an individual and is a citizen of Illinois, and is licensed to practice law in the State of Illinois.

13.     Rapp served as legal counsel and as general counsel for Kirlins, Inc. at all times relevant to the events alleged in this Complaint.

14.     Rapp served as legal counsel for Donald and D'Kids at all times relevant to the events alleged in this Complaint.

15.     Schmeideskamp, Robertson, Neu & Mitchell, LLP ("Schmeideskamp Firm") is an Illinois limited liability partnership engaged in providing legal services with a principal place of business in Illinois.

16.     Rapp is currently a partner in the Schmeideskamp Firm.

17.     Rapp was a partner in the Schmeideskamp Firm at the time of the more recent events alleged in this Complaint.

18.     Hutmacher & Rapp, P.C. ("Hutmacher Firm") is a dissolved Illinois professional corporation that was engaged in providing legal services with a principal place of business in Illinois.

19.     Rapp was a partner in the Hutmacher Firm.

20.     Rapp was a partner in the Hutmacher Firm at the time of the earlier events alleged in this Complaint.

## FACTUAL BACKGROUND

### Introduction

21.     This is a case about a once great and successful greeting card and gift shop company named Kirlins, Inc., based in Illinois, which has been looted and decimated by the rapacious greed, dishonesty and malfeasance of two brothers to the great detriment of their

younger brother, Donald. It is also a case about attorney Rapp and his law firms, who enabled the two older brothers, who represented almost every party mentioned in this lawsuit, and who passed themselves off as the "trusted family counsel", despite palpable and obvious conflicts of interest in derogation of their "duty of loyalty" and the Illinois Rules of Professional Conduct. The siblings' parents spent 50 years building this business with the intent to provide for future generations; Dale and Gary Kirlin have spent 20 years tearing it down.

22.     At one time, Kirlins, Inc. was the largest franchisee in the Hallmark Cards system in the country.

23.     The management of Kirlins Inc. was eventually taken over by two brothers, Defendants Dale T. Kirlin, Jr. and Gary F. Kirlin.

24.     Defendants' other brother, Plaintiff Donald, was not directly involved in managing the daily activities of the business. However, Donald owns and controls just less than one third (1/3) of the voting shares of Kirlins, Inc. through a family limited partnership, D'Kids Partners, to which he had contributed all of the voting shares previously owned by Donald personally.

25.     During the time in which Dale and Gary have run Kirlins, Inc., they have mismanaged the company and wasted its assets while enriching themselves.

26.     As a result of Dale and Gary's mismanagement, Kirlins, Inc. is substantially diminished in terms of size, revenues, and profits.

27.      In addition, Dale and Gary have engaged in shareholder minority oppression and discriminatory treatment of their brother, Donald.

28.     Upon information and belief, by combining bonuses, distributions, salaries, demand notes, and perquisites, Dale, Gary, and/or their respective family members have taken

out or received the benefit of $20 million each from Kirlins, Inc., for an aggregate of $40 million.

29.     By contrast, during the same period, Donald has received a small fraction from his ownership of Kirlins, Inc., in comparison to what Defendants Dale, Gary, and/or their respective family members received.

30.     Compounding the magnitude of Dale and Gary's discriminatory treatment are the breaches of ethical rules and fiduciary duties committed by Dale and Gary's longstanding counsel, Rapp, which both facilitated Dale and Gary's activities but hampered Donald's ability to discovery their misdeeds.

31.     At various times throughout the events alleged in this Complaint, Rapp and his firms have represented virtually every party to this lawsuit, despite conflicts of interest that should have been readily apparent to him. Moreover, Rapp and his firms failed to warn and properly advise Donald and D'Kids while they were being short-changed and fleeced by Rapp's other, and apparently more important clients; namely, Dale and Gary.

### The Family Business

32.     Dale T. Kirlin, Sr. ("Father"), along with his wife, Marion Kirlin ("Mother"), in the 1940's and thereafter pursued the "American Dream," worked hard, and through sheer determination and grit over five (5) decades built a Hallmark gift store empire.

33.     Father and Mother Kirlin are the parents of four (4) children:  Plaintiff Donald W. Kirlin, Defendant Dale T. Kirlin, Jr., Defendant Gary F. Kirlin, and sister Barbara Kirlin ("Barbara").

34.     The family gift store business was founded in the 1940's, and operated for a period of time under the name "Andes Candies."

35.     The family business was eventually branded under the name Kirlins, Inc., which was incorporated under the laws of Illinois on July 17, 1963.

36.     The Company is a franchisee of Hallmark Cards, Inc., and owns and operates Hallmark Gift Stores.

37.     On information and belief, at the time of Father Dale T. Kirlin, Sr.'s retirement, the Company was the largest franchisee in the Hallmark system, owning twice as many coveted Hallmark Gold Crown® Stores than any other franchisee in the country.

38.     Defendants Dale and Gary wanted to work in the family business, and their Father permitted them to do so.

39.     Plaintiff Donald elected to develop his own career path as a pilot.

40.     Sister Barbara Kirlin decided to leave Quincy, Illinois for California in approximately 1965, and eventually settled in the Houston, Texas area.

41.     Mother passed away around 1989, at the age of approximately 72, and Father passed away around 2009 at the age of approximately 94.

42.     At some point in time, prior to the events alleged in the Counts below, defendants Dale and Gary took control of the daily operations of the Kirlins, Inc.

43.     Dale is, and has been at all relevant times to this litigation, the Chief Executive Officer and a Director of Kirlins, Inc.

44.     Gary is, and has been at all relevant times to this litigation, the President and a Director of Kirlins, Inc.

45.     Dale and Gary proceeded to ransack, raid, and loot Kirlins, Inc. for the benefit of Dale and Gary and their families, with self-dealing, conflicts of interest, disguised dividends, exorbitant salaries, bonuses, distributions, tax evasions, financial engineering, and redemptions.

46.     Defendants Dale and Gary failed to reinvest or diversify or otherwise strategize for the long-term viability of Kirlins, Inc.

47.     Defendants Dale and Gary failed to cultivate all strategic business options or exercise options for the benefit of stockholders, and instead engaged in self-dealing.

48.     In fact, on multiple occasions, Plaintiff Donald suggested that Defendants Dale and Gary retire and engage professional managers to run Kirlins, Inc., engage consultants to help improve the profitability of Kirlins, Inc., and/or otherwise undertake efforts to protect Kirlins, Inc. and maximize its profits. Defendants Dale and Gary always refused.

49.     Under the leadership and management of Father and Mother, Kirlins, Inc. grew from nothing into a very profitable company. At the approximate time of Father's retirement, the Company owned and operated over 115 Hallmark Gift Stores, across approximately 10 states, with approximately 2,000 employees, and with revenues of over $120 million.

50.     Under defendants Dale and Gary's management tenure, as of December 31, 2015, in stark contrast to the state of the business at Father's retirement, Kirlins, Inc. owned and operated approximately 60 Hallmark stores, across approximately 7 states, employed approximately 1,250 people and has revenues of approximately $60 million.

51.     Upon information and belief, Kirlins, Inc. is in debt and struggling financially.

52.     Under the control of Dale and Gary, this once great and proud company has been diminished in size, stature, and profitability through Dale and Gary's mismanagement, greed, negligence, recklessness, dishonesty, unlawfulness, and sheer incompetence.

### Stock Ownership & Board Participation

53.     At all times relevant in this litigation, plaintiff Donald has been a Director of Kirlins, Inc.

54. At all times relevant in this litigation, defendant Dale has been an officer, shareholder, and director of Kirlins, Inc.

55. At all times relevant in this litigation, defendant Gary has been an officer, shareholder, and director of Kirlins, Inc.

56. Plaintiff Donald, through his family limited partnership, D'Kids, currently owns 33,030.75 voting shares of the Company, which represents an approximate 33% equity interest in the Company.

57. Donald owned these shares personally before transferring them to D'Kids.

58. Defendant Dale currently owns 33,031.75 voting shares of the Company, which represents an approximately 33% equity interest in the Company.

59. Dale's equity interest is greater than the equity interest held by D'Kids/Donald.

60. Defendant Gary currently owns 33,031.75 voting shares of the Company, which represents an approximately 33% equity interest in the Company.

61. Gary's equity interest is greater than the equity interest held by D'Kids/Donald.

62. There are three (3) members of the board of directors: Donald, Dale and Gary.

63. Upon information and belief, Kirlins, Inc. pays each director a monthly board fee of $3,125.

64. Kirlins, Inc. also leases real estate in Quincy, Illinois. The name of the landlord and the title holder to the real property is Kirlin Properties, Inc., which was formed under Illinois law on December 27, 1967.

65. Kirlin Properties, Inc. is equally owned indirectly by the four siblings: Donald, Barbara, Dale, and Gary.

66. Kirlin Properties, Inc. owns five hundred (500) voting shares of Kirlins, Inc.

67.     There had been another member of the Kirlins, Inc. family of businesses called Kirlins Wholesale, Inc.

68.     Upon information and belief, Kirlins Wholesale, Inc. was 100% owned by Kirlins, Inc.

69.     Kirlins Wholesale, Inc. was incorporated in Illinois on November 27, 1967.

70.     Kirlins Wholesale, Inc. was a wholesale buying company that would buy products from Hallmark and re-sell them at a 5% mark-up to Kirlins, Inc.

71.     The excess cash generated by Kirlins Wholesale, Inc. as a result of the mark-up was routinely distributed to the four siblings and father.

72.     Defendants Dale and Gary decided to dissolve Kirlins Wholesale, Inc. so as to avoid paying Plaintiff Don and sister Barbara the expected cash distributions from Kirlins Wholesale, Inc.

73.     Kirlins Wholesale, Inc.'s business generated a net revenue item for distribution to the Kirlins, Inc. shareholders, including Donald and D'Kids.

74.     On January 5, 2010, Kirlins Wholesale, Inc. was dissolved at the direction of Dale and Gary.

### The "Disguised Dividend" Transactions

75.     For many years, Kirlins, Inc. had a practice of paying "bonuses" to the Father and the four (4) children.

76.     Kirlins, Inc. would record these bonuses as "compensation expenses" and thereby reduce the taxable net income that Kirlins would pay to the government in taxes.

77.     After receiving these bonuses, the Father and the children would then turn around and lend some or all of the bonus money back to Kirlins, Inc. in exchange for demand notes ("Demand Notes").

78.     The Demand Notes were payable at any time upon demand by the holder.

79.     These "bonuses" were, in actuality, disguised dividends that should have been taxable at the Company level and then again at the shareholder level.

80.     The only reason for calling these distributions "bonuses" was to reduce the taxable income of the Company.

81.     The bonuses, which were really disguised dividends, and the resulting Demand Notes, were distributed unequally among the shareholders.

82.     Rather than distributing the disguised dividends pro rata to the shareholders based on their shareholdings, Kirlins, Inc. discriminated amongst them and paid preferential dividends to Defendants Dale and Gary.

83.     Upon information and belief, Dale and Gary, and/or their respective families, received Demand Notes in excess of $10 million each.

84.     The demand notes were in the names of Dale, Gary, and/or their spouses and/or children.

85.     Upon information and belief, Dale has so far received approximately $8 million in cash from Kirlins in the form of redemptions of his Demand Notes.

86.     Upon information and belief, Gary has so far received approximately $8 million in cash from Kirlins in the form of redemptions of his Demand Notes.

87.     As of August 2015, and August 2014, upon information and belief, the remaining amounts of the Demand Notes held by Dale, Gary and Donald and their families were as follows:

| NAME | Aug – 15 Balance | Aug – 14 Balance |
|---|---:|---:|
|  |  |  |
| Jacque Kirlin (Dale's wife) | 1,364,778.14 | 1,972,688.14 |
| Dale T. Kirlin, Jr. | 24,000.00 | 24,000.00 |
| Jacque Kirlin (Dale's daughter) | 24,000.00 | 24,000.00 |
| Bradford Thomas Kirlin (Dale's son) | 0.00 | 47,000.00 |
| Craig Michael Kirlin (Dale's son) | 0.00 | 47,000.00 |
| Gary F. Kirlin | 0.00 | 635,210.61 |
| Joann Kirlin (Gary's wife) | 1,319,000.00 | 1,319,000.00 |
| Gary F. Kirlin | 56,552.50 | 102,250.00 |
| Joann Kirlin (Gary's wife) | 0.00 | 21,000.00 |
| Gary F. Kirlin | 24,000.00 | 24,000.00 |
| Joann Kirlin (Gary's wife) | 24,000.00 | 24,000.00 |
| Gary F. Kirlin | 47,000.00 | 47,000.00 |
| Donald W. Kirlin | 0.00 | 24,000.00 |
| Susie Kirlin (Donald's wife) | 0.00 | 24,000.00 |
|  |  |  |
| **FAMILY DEMAND NOTES** | **2,883,330.64** | **4,335,148.75** |

88.    Kirlins, Inc. only has one class of common stock.

89.    The unequal distribution of dividends across common stock shareholders is in derogation of Illinois law.

90.    Plaintiff Donald redeemed most of his Demand Notes many years ago in order to fund his aviation businesses.

91.    Donald's redeemed Demand Notes totaled approximately $2 million.

92.    On information and belief, proceeds from the disguised dividends enabled Defendants Dale and Gary to invest in stocks and to invest in ventures such as Blackjack Marina at Mark Twain Lake in Perry, Missouri.

93.    Attorney Rapp and his law firms represented Donald at all relevant times, including appointments as Donald's trustee and executor of his will. At no point in time did attorney Rapp or his law firms privately advise Donald that he was receiving substantially less than his brothers and that he had a right under Illinois law to demand equal treatment and an

accounting. At no point in time did attorney Rapp or his law firms advise Donald to assert his rights to not be on the short end of discriminatory financial treatment or to assert his rights under Illinois law against oppression of a minority shareholder.

94.     At various times in the past, sister Barbara redeemed her Demand Notes.

95.     Upon information and belief, sister Barbara was diagnosed with a serious medical illness. Defendants Dale and Gary, assisted and enabled by Defendant Rapp and his law firm, took advantage of Barbara's situation and redeemed Barbara's voting stock at an absurdly low price without the benefit of a third-party appraisal and redeemed her remaining Demand Notes while she was under severe emotional and mental duress. At the time, Rapp was sister Barbara's "trusted advisor" as her personal attorney and the executor of her will.

### Exorbitant Compensation to Dale and Gary
### as Salaries, Bonuses, and Perquisites

96.     Upon information and belief, Dale and Gary have paid themselves substantial distributions, bonuses and salaries, in addition to lucrative perquisites such as car allowances, country club dues and payments, insurance benefits, split-dollar life insurance, and high travel and entertainment expenses (collectively, "Exorbitant Distributions").

97.     Dale and Gary never presented to the Board any resolution related to their compensation, distributions, bonuses, or perquisites.

98.      In fact, Dale and Gary, aided and abetted by Rapp and his law firms, deliberately withheld and concealed this information from Donald at Board of Director meetings.

99.     A resolution on Dale and Gary's compensation, bonuses, and perquisites never came before the Board of Directors, notwithstanding the fact that Rapp and his law firms acted as general counsel to Kirlins, Inc. and that Rapp attended Board meetings. Rapp and his law firms also represented Donald and D'Kids at all relevant times.

100.     Instead, Dale and Gary, assisted and enabled by attorney Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, unilaterally paid themselves whenever they decided.

101.     Dale and Gary's self-dealing compensation practices cheated Donald and D'Kids out of his fair share of distribution income by disguising the dividends paid to defendants Dale and Gary as salaries and bonuses.

102.     Dale and Gary disguised these dividend payments as compensation and bonuses so that they would not have to pay identical payments to Donald or D'Kids.

103.     Dale and Gary's misdeeds were all committed with the knowledge, assistance and enabling of attorney Rapp, the Hutmacher Firm, and the Schmeideskamp Firm.

104.     Neither attorney Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm, ever mentioned to Donald or D'Kids that the "Exorbitant Distributions" paid to Dale and Gary were disguised dividends, or that Donald and/or D'Kids were being short-changed as a result.

105.     Neither attorney Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm, ever mentioned to Donald or D'Kids that salary decisions and bonus decisions should be brought before the Board of Directors in a proper resolution.

106.     Neither attorney Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm, ever mentioned to Donald or D'Kids that they had standing to demand an accounting.

## Rapp and his Law Firms' Many Conflicts of Interest

107.     At all times relevant to this litigation, attorney Rapp fashioned himself as the "family attorney" and "Company attorney".

108.     Rapp, individually and through the Schmeideskamp Firm and the Hutmacher Firm, represented every participant in this lawsuit, and owed each one the highest duty of loyalty and care under the Illinois Rules of Professional Ethics.

13

109.    Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, served and continue to serve as Kirlins, Inc.'s principal legal advisor.

110.    Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, until recently represented plaintiff Donald personally.

111.    Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, until recently represented D'Kids.

112.    Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, until recently was named as the executor of Donald's estate plan.

113.    Rapp had also been appointed to be the executor of Donald's estate plan.

114.    In short, plaintiff Donald placed the highest degree of trust in Rapp and his law firms, and entrusted his most important family assets to his care.

115.    Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, until recently represented sister Barbara personally.

116.    Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, until recently was named as the executor of sister Barbara's estate plan.

117.    Upon information and belief, Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, represents Dale and certain of his family members personally.

118.    Upon information and belief, Rapp, his prior law firm, the Hutmacher Firm, and his current law firm, the Schmeideskamp Firm, represents Gary and certain of his family members personally.

119.    Upon information and belief, Rapp also represented Mother and Father Kirlin personally.

120.    Plaintiff Donald did not waive any conflict or potential conflict of interest with respect to Rapp's or his law firms' representation.

121.    Plaintiff D'Kids did not waive any conflict or potential conflict of interest with respect to Rapp's or his law firms' representation.

122.    Donald did not waive any conflict or potential conflict of interest with respect to the Hutmacher Firm's representation.

123.    D'Kids did not waive any conflict or potential conflict of interest with respect to the Hutmacher Firm's representation.

124.    Donald did not waive any conflict or potential conflict of interest with respect to the Schmeideskamp Firm's representation.

125.    D'Kids did not waive any conflict or potential conflict of interest with respect to the Schmeideskamp Firms representation.

126.    Donald was never asked by Rapp, the Hutmacher Firm, or the Schmeideskamp Firm to waive any conflict or potential conflict of interest.

127.    D'Kids was never asked by Rapp, the Hutmacher Firm, or the Schmeideskamp Firm to waive any conflict or potential conflict of interest.

128.    Most of Rapp's billings, and the billings he made through the Hutmacher Firm and the Schmeideskamp Firm, were paid by Kirlins, Inc.

129.    Rapp, the Hutmacher Firm, and the Schmeideskamp Firm took direction directly from Defendants Dale and Gary.

130.    Rapp, the Hutmacher Firm, and the Schmeideskamp Firm enabled the machinations of Dale and Gary at the expense of Plaintiffs Donald and D'Kids.

131.   While Rapp, the Hutmacher Firm, and the Schmeideskamp Firm were enabling the machinations of Dale and Gary, they held themselves out as representing the interests of Donald and D'Kids.

132.   As a direct and proximate result of the conflicts of interest, negligence, and dereliction of fiduciary duty of Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, Donald and D'Kids have been short-changed and cheated out of millions of dollars of value from Kirlins, Inc.

133.   The decline in the value of Kirlins, Inc. damaged D'Kids as a shareholder by diminishing the value of its interests, and by depriving it of distributions and dividends.

134.   At all times relevant to this litigation, throughout mismanagement of Kirlins, Inc. by Defendants Dale and Gary, Rapp served as Kirlins, Inc.'s attorney and outside general counsel, and actively schemed and plotted with defendants Dale and Gary at the expense of Rapp's other less important clients, including Plaintiffs Donald and D'Kids.

135.   Throughout the events described in this Complaint, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm charged Donald and D'Kids fees for legal services purportedly provided to protect the rights and interests of Donald and D'Kids.

136.   Throughout the events described in this Complaint, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm actively discouraged Donald and D'Kids from objecting to Dale and Gary's schemes and from otherwise protecting their own interests and the interests of Kirlins, Inc.

137.   Despite charging fees to Donald and D'Kids for legal services and representation, Rapp, the Hutmacher Firm, and the Schmeideskamp firm withheld or concealed information

from Donald and D'Kids related to the ruinous events the attorneys were conducting with Gary and Dale, as further described herein.

## The Brokerage Conflict of Interest

138.    Defendant Dale has a son named Bradford Kirlin ("Bradford"), who is in his 40's and resides in Quincy, IL.

139.    Bradford had served in a managerial position at Kirlins prior to embarking on a new career.

140.    Upon information and belief, Bradford, after three attempts, received a license as a Series 7 Registered Securities Representative and began work for a brokerage house.

141.    Dale and Gary transferred the management of Kirlins, Inc.'s retirement plans to Bradford to manage.

142.    At the time of the transfer to Bradford, on information and belief, the Kirlins, Inc. account had assets under management of approximately $16 million dollars.

143.    Bradford lacked appropriate experience to manage Kirlin Inc.'s retirement plans.

144.    An account the size of Kirlins, Inc.'s account represented very lucrative and profitable work for Bradford and his brokerage firm.

145.    Dale and Gary made the decision to transfer the management of Kirlins, Inc.'s account without consulting the Board.

146.    Dale and Gary's transfer of the management of Kirlins, Inc.'s retirement account to his son was a conflict of interest.

147.    The decision whether to transfer the management of Kirlins, Inc.'s retirement account should have been brought to the Board of Directors for deliberation and a vote.

17

148.     Due to the conflict of interest, Dale should have recused himself from voting on any Board of Directors decision related to transferring the management of Kirlins, Inc.'s retirement account to Dale's son Bradford.

149.     Attorney Rapp, the Hutmacher Firm, and/or the Schmeideskamp Firm knew of this transfer and assisted and enabled it.

150.     Neither Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm ever advised Donald or D'Kids before-the-fact of this transfer.

151.     Neither Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm ever advised Donald or D'Kids that they had standing to raise an objection to the Board, to demand Board deliberations and a vote, and to demand an accounting.

## The Health Insurance Conflict of Interest

152.     Defendant Dale has a son-in-law named Jeffrey Kennedy, who is in his 40's and lives in the Quincy, IL area.

153.     Jeffrey decided to enter the insurance and wealth management business.

154.     Jeffrey did not have appropriate experience to manage Kirlins, Inc.'s health insurance plans.

155.     The Kirlins, Inc. health insurance plan is a large account, on information and belief, covering 1,000-2,000 employees, and, on information and belief, management of Kirlins, Inc.'s health insurance plan is extremely lucrative.

156.     Dale and Gary transferred the management of Kirlins, Inc.'s health insurance plan to Jeffrey.

157.     Dale and Gary made the decision to transfer the management of Kirlins, Inc.'s health insurance plan to Jeffrey without consulting the Board.

158.    Dale's transfer of the management of Kirlins, Inc.'s health insurance plan to his son-in-law was a conflict of interest.

159.    The decision whether to transfer the management of Kirlins, Inc.'s health insurance plan should have been brought to the Board of Directors for deliberation and a vote.

160.    Due to the conflict of interest, Dale should have recused himself from voting on any Board of Directors decision related to transferring the management of Kirlins, Inc.'s health insurance plan to Dale's son-in-law Jeffrey.

161.    Attorney Rapp, the Hutmacher Firm, and/or the Schmeideskamp Firm knew of this transfer and assisted and enabled it.

162.    Neither Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm ever advised Donald or D'Kids before-the-fact of this transfer.

163.    Neither Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm ever advised Donald or D'Kids that they had standing to raise an objection to the Board, to demand Board deliberations and a vote, and to demand an accounting.

### The Private Jet Conflict of Interest

164.    On information and belief, at the direction of Dale and Gary, Kirlins, Inc. purchased a Cessna Citation II jet airplane for $1.8 million.

165.    Dale and Gary directed Kirlins, Inc. to purchase the Cessna Citation II for ostensible business purposes.

166.    In practice, Dale, Gary, and their families used the Cessna Citation II for frequent personal travel with no business purpose.

167.    The Cessna Citation II held up to eight passengers plus the crew.

168.    Title to the Cessna Citation II was held by a company called either Kir-Nie Aviation, Inc. or Kir-Nie, Inc., both Illinois corporations and both now dissolved.

169.    Dale and Gary also directed Kirlins, Inc. to hire or cause the hire of a full-time pilot to be at the ready whenever Dale and/or Gary and/or their families desired to travel somewhere.

170.    On information and belief, the pilot was paid a salary plus benefits of approximately $100,000.

171.    In addition, the pilot's wife from time-to-time flew as a copilot and was compensated for her services, even though the Cessna Citation II requires only one pilot.

172.    Additionally, Kirlins, Inc. bore the cost of the insurance for the Cessna Citation II, the maintenance and repair, and the hangar storage space which, upon information and belief, was at least $250,000 annually.

173.    Dale and/or Gary and/or their families used the Cessna Citation II, on information and belief.

approximately 90 hours per year, which equated to fuel costs in excess of $70,000 per year.

174.    On information and belief, the Cessna Citation II was used for Kirlins, Inc. purposes only three to four times per year.

175.    Plaintiff Donald objected to ownership of the Cessna Citation II repeatedly as an unnecessary expense.

176.    There was no legitimate corporate purpose for the Cessna Citation II, especially given the availability of commercial and charter air transportation.

177. Instead, Dale and Gary maintained the Cessna Citation II for vanity reasons and for their personal use, and refused to sell the airplane even while closing stores and experiencing declining revenues.

178. The Cessna Citation II was eventually sold after many years of use for approximately $500,000, on information and belief.

179. At no time did Dale or Gary ever discuss the ongoing costs related to ownership of the Cessna Citation with the Board of Directors.

180. Dale did not adequately reimburse Kirlins, Inc. for his or his family's personal use of the business aircraft.

181. Gary did not adequately reimburse Kirlins, Inc. for his or his family's personal use of the business aircraft.

182. Neither Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm ever advised Donald or D'Kids that Kirlins, Inc. was being short-changed because Dale and Gary were not reimbursing Kirlins, Inc. for their personal aircraft use.

183. Neither Rapp, the Hutmacher Firm, nor the Schmeideskamp Firm ever advised Donald or D'Kids that they had standing, on behalf of Kirlins, to demand reimbursement from Dale or Gary, and to seek an accounting.

**COUNT I**
**CIVIL RICO**
**AGAINST ALL DEFENDANTS**

184. Plaintiffs adopt and incorporate Paragraphs 1-180 of this Complaint as if fully set forth herein.

185. Throughout the conduct related above, Defendants Dale and Gary intended to defraud Donald and D'Kids. Specifically, their conduct included:

(a)      Through their Disguised Dividend scheme, Dale and Gary misrepresented dividends as bonuses with the intention of cutting Donald and D'Kids out of dividends that were rightly theirs and with the intention of concealing revenues from tax agencies;

(b)      Dale and Gary collected exorbitant compensation in the form of salaries, bonuses, and perquisites with the intention of reducing the value of the shares held by Donald and D'Kids and cutting Donald and D'Kids out of dividends that were rightly theirs;

(c)      Dale and Gary steered lucrative Kirlins, Inc. contracts to relatives who were too inexperienced to competently and responsibly carry out their obligations with the intention of benefiting close relatives to the detriment of the value of Donald and D'Kids' Kirlins, Inc. shares;

(d)      Dale and Gary directed Kirlins, Inc. to purchase a Cessna Citation II, ostensibly for business purposes, while intending to use the aircraft, and in fact using the aircraft, for personal purposes without reimbursement to Kirlins, Inc.

186.    Attorney Rapp, the Hutmacher Firm, and the Schmeideskamp Firm assisted Dale and Gary with their fraudulent schemes by:

(a)      Advising Dale and Gary how to commit their fraudulent and wrongful acts;

(b)      Preparing legal documents and offering other legal services in support of Dale and Gary's fraudulent and wrongful acts;

(c)      Concealing Dale and Gary's fraudulent and wrongful acts from Donald

and D'Kids, even though Donald and D'Kids were clients of Rapp and his

Firms;

(d)     Convincing Donald and D'Kids to act in a manner contrary to the interests

of Kirlins, Inc., Donald, and D'Kids, and beneficial to the interests of

Dale and Gary.

187.    Dale and Gary, who are brothers, directors and shareholders of Kirlins, Inc., and officers of Kirlins, Inc., are an enterprise for purposes of federal RICO laws.

188.    Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, as counsel and legal advisors to Dale and Gary relative to Dale and Gary's misdeeds, join Dale and Gary in the enterprise for purposes of federal RICO laws.

189.    Dale, Gary, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm engaged in a pattern of racketeering activity by committing at least two predicate acts of racketeering within a 10 year period.

190.    Defendants Dale, Gary, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, committed wire fraud under 18 U.S.C. § 1343 in that they participated in the above-described scheme to defraud and mislead Donald and D'Kids, and with the intent to defraud Donald and D'Kids, caused interstate wire transmissions in furtherance of the fraudulent scheme. Specifically, the Defendants:

(a)     In September, 2015, in anticipation of the September 21, 2015 Kirlins, Inc.

board meeting, emailed Plaintiff Donald the Kirlins, Inc. 2014 profit and

loss statement and balance sheet, which fraudulently failed to account for

the Disguised Dividends and Demand Notes;

(b)     On March 19, 2018, emailed Plaintiff Donald the Kirlins, Inc. 2007 profit

and loss statement and balance sheet, which fraudulently failed to account

for the Disguised Dividends and Demand Notes;

(c)     3/19/08 emailed Kirlins balance sheet for 2007 and profit and loss

statement;

(d)     Otherwise used interstate wire transmissions to convey containing

fraudulent and/or misleading information to Donald and/or D'Kids in

furtherance of the scheme described above.

191.    Dale, Gary, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, committed

mail fraud under 18 U.S.C. § 1341 in that they participated in the above-described scheme to

defraud and mislead Donald and D'Kids, and with the intent to defraud Donald and D'Kids, and

used the mails in furtherance of this fraudulent scheme. Specifically, the Defendants:

(a)     On December 8, 2015, mailed loan application documents to Donald,

which included a purportedly detailed financial analysis of Kirlins, Inc.'s

combined business interests, but which fraudulently failed to account for

the Disguised Dividends and Demand Notes;

(b)     Otherwise used the mails to convey fraudulent and/or misleading

information to Donald and/or D'Kids in furtherance of the scheme

described above.

192.    Defendants intended that Plaintiffs Donald and D'Kids rely on the fraudulent

statements transmitted through interstate wire transmission and the mails in making decisions

with respect to how to vote on Kirlins, Inc. matters, including but not limited to whether to

approve of loan applications, whether to agree to stock sale agreements, and whether to approve

store closures or transfers.

193.    Plaintiffs Donald and D'Kids did, in fact, rely on the fraudulent statements transmitted through interstate wire transmission and the mails in making decisions with respect to how to vote on Kirlins, Inc. matters, including but not limited to whether to approve of loan applications, whether to agree to stock sale agreements, and whether to approve store closures or transfers.

194.    These predicate acts of mail fraud and wire fraud are related in that they were all designed to mislead Donald and D'Kids and to diminish Donald and D'Kids' interest in Kirlins, Inc. for the benefit of the Defendants.

195.    These predicate acts of mail fraud and wire fraud pose a threat of continued criminal activity in that they took place over a substantial period of time.

196.    These predicate acts of mail fraud and wire fraud pose a threat of continued criminal activity in that there is a threat of repetition extending indefinitely into the future.

197.    These predicate acts of mail fraud and wire fraud pose a threat of continued criminal activity in that they represent Defendants' ongoing and regular way of doing business.

198.    Defendants' fraudulent scheme has caused Donald and D'Kids to suffer distinct injuries. Specifically:

(a)    Defendants' Disguised Dividend scheme, and associated mail fraud and wire fraud, permitted Dale and Gary to receive dividends from Kirlins, Inc. without paying the same dividends to Donald and D'Kids, and to also correspondingly reduce the value of Kirlins, Inc. and its shares;

(b)    Dale and Gary's exorbitant compensation scheme, and associated mail fraud and wire fraud, permitted Dale and Gary to raid the assets of Kirlins, Inc. for their personal benefit while at the same time correspondingly

reducing the value of Kirlins, Inc. and its shares;

(c)     Dale and Gary's steering of lucrative Kirlins, Inc. contracts to relatives
who were too inexperienced to competently and responsibly carry out their
obligations, and associated mail fraud and wire fraud, permitted Dale and
Gary to enrich their favored relatives to the detriment of Kirlins, Inc.'s
assets and the value of its shares.

(d)     Dale and Gary's personal use of the Cessna Citation II without properly
reimbursing Kirlins, Inc., and associated mail fraud and wire fraud, was a
waste of corporate assets which caused a corresponding reduction in the
value of Kirlins;

(e)     The Defendants' collective inducing Donald and D'Kids to refrain from
taking action to protect themselves by, for example, engaging non-
conflicted legal counsel that would actually act in Plaintiffs' interest.

199.    As a result of the foregoing, D'Kids and Donald have suffered damages in an
amount in excess of $20 million exclusive of interest.

WHEREFORE, plaintiffs Donald and D'Kids respectfully pray that this Court enter
judgment in their favor, and against defendants Dale, Gary, Rapp, the Hutmacher Firm, and the
Schmeideskamp Firm, and award all available relief and damages, including but not limited to:

(a)  An award of treble the damages D'Kids and Donald establish for the above-
allege misconduct;

(b)  An award of attorneys' fees and costs;

(c)  Any such other and further relief as this Court may deem to be just and
proper.

## COUNT II
## CIVIL RICO CONSPIRACY
## <u>AGAINST ALL DEFENDANTS</u>

200.    Plaintiffs adopt and incorporate Paragraphs 1-196 of this Complaint as if fully set forth herein.

201.    Dale, Gary, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm agreed to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. Specifically, they knowingly agreed to perform the following conduct:

   (a)    Through their Disguised Dividend scheme, Dale and Gary misrepresented dividends as bonuses with the intention of cutting Donald and D'Kids out of dividends that were rightly theirs and with the intention of concealing revenues from tax agencies;

   (b)    Dale and Gary collected exorbitant compensation in the form of salaries, bonuses, and perquisites with the intention of reducing the value of the shares held by Donald and D'Kids and cutting Donald and D'Kids out of dividends that were rightly theirs;

   (c)    Dale and Gary steered lucrative Kirlins, Inc. contracts to relatives who were too inexperienced to competently and responsibly carry out their obligations with the intention of benefiting close relatives to the detriment of the value of Donald and D'Kids' Kirlins, Inc. shares;

   (d)    Dale and Gary directed Kirlins, Inc. to purchase a Cessna Citation II, ostensibly for business purposes, while intending to use the aircraft, and in fact using the aircraft, for personal purposes without reimbursement to Kirlins, Inc.;

    (e)      Attorney Rapp, the Hutmacher Firm, and the Schmeideskamp Firm
agreed to assist and facilitate Dale and Gary with their fraudulent schemes
by giving legal advice, performing legal services, and concealing these
activities from Donald and D'Kids; and

    (f)      Attorney Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, fooled
Donald and D'Kids into believing that the attorneys were representing and
protecting them.

202.    Dale, Gary, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm agreed that
they would mislead Donald and D'Kids with the intent to defraud Donald and D'Kids by using
the mails and interstate wire system, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

203.    Defendants' conspiracy has caused Donald and D'Kids to suffer distinct injuries.
Specifically:

    (a)      Defendants' Disguised Dividend scheme, and associated mail fraud and
wire fraud, permitted Dale and Gary to receive dividends from Kirlins,
Inc. without paying the same dividends to Donald and D'Kids, and to also
correspondingly reduce the value of Kirlins, Inc. and its shares;

    (b)      Dale and Gary's exorbitant compensation scheme, and associated mail
fraud and wire fraud, permitted Dale and Gary to raid the assets of Kirlins,
Inc. for their personal benefit while at the same time correspondingly
reducing the value of Kirlins, Inc. and its shares;

    (c)      Dale and Gary's steering of lucrative Kirlins, Inc. contracts to relatives
who were too inexperienced to competently and responsibly carry out their
obligations, and associated mail fraud and wire fraud, permitted Dale and

Gary to enrich their favored relatives to the detriment of Kirlins, Inc.'s assets and the value of its shares;

(d)  Dale and Gary's personal use of the Cessna Citation II without properly reimbursing Kirlins, Inc., and associated mail fraud and wire fraud, was a waste of corporate assets which caused a corresponding reduction in value; and

(e)  The Defendants' collective inducing Donald and D'Kids to refrain from taking action to protect themselves by, for example, engaging non-conflicted legal counsel that would actually act in Plaintiffs' interest.

204.  As a result of the foregoing, D'Kids and Donald have suffered damages in an amount in excess of $10 million exclusive of interest.

WHEREFORE, plaintiffs Donald and D'Kids respectfully pray that this Court enter judgment in their favor, and against defendants Dale, Gary, Rapp, the Hutmacher Firm, and the Schmeideskamp Firm, and award all available relief and damages, including but not limited to:

(a)  An award of treble the damages D'Kids and Donald establish for the above-alleged misconduct;

(b)  An award of attorneys' fees and costs;

(c)  Any such other and further relief as this Court may deem to be just and proper.

## COUNT III
## OPPRESSION OF A MINORITY SHAREHOLDER
## PURSUANT TO 806 ILCS § 5/12.56 et seq.
## AGAINST DALE KIRLIN AND GARY KIRLIN

205.  Plaintiffs adopt and incorporate Paragraphs 1-201 of this Complaint as if fully set forth herein.

206.     Kirlins, Inc. is a non-public corporation as described in 806 ILCS § 5/12.56

207.     D'Kids is a shareholder in Kirlins, Inc., as described in 806 ILCS § 5/12.56.
Donald was the shareholder before he transferred all of his Kirlins, Inc. shares into D'Kids.

208.     Donald is a Director of Kirlins, Inc., as described in 806 ILCS § 5/12.56.

209.     The overbearing and heavy-handed course of conduct of defendants Dale and
Gary as alleged above has resulted in the intentional oppression of D'Kids' rights as a
shareholder of Kirlins, Inc. in violation of 806 ILCS § 5/12.56(a).

210.     In oppressing D'Kids' rights as a shareholder of Kirlins, Inc., Dale and Gary's
conduct was intentional, fraudulent, malicious, willful, wanton, without just cause, reckless, in
the absence of good faith and committed with the intent to injure D'Kids and Donald.

211.     The conduct of Dale and Gary as detailed above was illegal, oppressive, and/or
fraudulent with respect to D'Kids as shareholder and Donald as Director;

212.     The conduct of Dale and Gary as detailed above included the misapplication or
waste of Kirlins, Inc.'s corporate assets.

213.     Plaintiffs Donald and D'Kids were, at all relevant times, shareholders or members
of Kirlins, Inc. at the time the transactions complained of occurred.

214.     This lawsuit is not a collusive action to confer jurisdiction that the court would
otherwise lack.

215.     Defendants Dale and Gary's misconduct, as detailed above, creates doubt that
Dale and Gary are disinterested or that the transactions challenged were otherwise the product of
a valid exercise of the business judgment rule, so any demand to obtain their action would be
futile.

216.    Defendant Dale and Gary are themselves involved in the matters complained of, so any demand to obtain their action would be futile.

217.    Defendants Dale and Gary are not disinterested or independent, as they and their families derived or expected to derive personal financial benefits from the transactions at issue, so any demand to obtain their action would be futile.

218.    Defendants Dale and Gary are the directors who participated in, authorized, or acquiesced in the wrongdoing alleged, so any demand to obtain their action would be futile.

219.    Defendants Dale and Gary engaged in activities that betrayed their lack of disinterest or independence, including the awarding of lucrative contracts to relatives, the preferential treatment for themselves with respect to the disguised dividends, and the personal use of the corporate airplane.

220.    These same self-interested transactions are not entitled to the protection of the business judgment rule because the substance of the transactions at issue are patently one-sided and preferential at the expense of the corporation, and the individual defendants did not engage in procedural due care because these decisions were not informed, discussed, or debated, and the benefits or detriments to the corporation were never considered.

221.    As a direct and proximate result of the actions of Dale and Gary's misconduct as detailed above:

> (a)  D'Kids, and Donald through his ownership of D'Kids, did not receive the equal treatment, dividends, or distributions to which it was entitled as a shareholder of Kirlins, Inc.;
>
> (b)  Dale and Gary have acted in a manner that is illegal, oppressive, and/or fraudulent; and

(c)  Dale and Gary have engaged in corporate waste and mismanagement.

WHEREFORE, plaintiffs D'Kids and Donald respectfully pray that this Court enter judgment in its favor, and against defendants Dale and Gary, and award all applicable relief available to it under 806 ILCS 5/12.56, including but not limited to:

(a)  An order requiring the prohibition, alteration, or setting aside of the wrongful action(s) of defendants detailed herein;

(b)  A permanent injunction:

    i.  enjoining defendants from continuing to make or receive payments under the Demand Notes (as alleged above);

    ii.  enjoining Defendants from taking improper, unilateral dividends, distributions and bonuses or other compensation that are in actuality "disguised dividends" or exorbitant compensation; and

    iii.  enjoining defendants from undervaluing the company:

(c)  The removal from office of both Dale Kirlin and Gary Kirlin as directors and officers;

(d)  An accounting with respect to the matters in dispute;

(e)  An award of compensatory damages in an amount to be proven at trial;

(f)  The appointment of a conservator to manage the business and affairs of Kirlins, Inc. and to serve for an established term until D'Kids is made whole, under the conditions prescribed by the court;

(g)  Payment of dividends that should have been paid to D'Kids and Donald;

(h)  An order requiring Dale and Gary or Kirlins, Inc. to purchase all, but not less

than all, of the shares of D'Kids' for their fair value and on the terms

determined under 805 ILCS § 5/12.56(e) and other applicable law;

(i)  Any and all compensatory damages available to D'Kids and/or Donald;

(j)  The dissolution of the corporation if the Court determines that no remedy

specified in 805 ILCS § 5/12.56(a)(1)-(11) or other alternative remedy is

sufficient to resolve the matters in dispute;

(k)  An award of attorney's fees and expenses incurred in bringing this action; and

(l)  Any such other and further relief to which D'Kids may be entitled.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
## AGAINST DALE KIRLIN AND GARY KIRLIN

222.    Plaintiffs adopt and incorporate Paragraphs 1-218 of this Complaint as if fully set

forth herein.

223.    By virtue of the Illinois Business Corporation Act, the Bylaws adopted by Kirlins,

Inc., and common law, Dale and Gary owed fiduciary duties to Donald in their capacities as

Officers, Directors, and Shareholders of Kirlins, Inc. while Donald was a Director and

Shareholder of Kirlins, Inc.

224.    By virtue of the Illinois Business Corporation Act, the Bylaws adopted by Kirlins,

Inc., and common law, Dale and Gary owed fiduciary duties to D'Kids in their capacities as

Officers, Directors, and Shareholders of Kirlins, Inc. while D'Kids was a shareholder.

225.    By virtue of the Illinois Business Corporation Act, the Bylaws adopted by Kirlins,

Inc., and common law, Dale and Gary owed fiduciary duties to Kirlins, Inc. in their capacities as

Officers, Directors, and Shareholders of Kirlins, Inc.

33

226.    In particular, at all times relevant hereto, Dale and Gary owed specific duties to Kirlins, Inc., Donald, and D'Kids, including but not limited to:

    (a)  The duty to put the financial interests of Kirlins, Inc. and its shareholders above their own selfish interests;

    (b)  The duty of loyalty and care which required Dale and Gary to refrain from gross negligence, recklessness, unlawful conduct, mismanagement, and waste;

    (c)  The duty of loyalty and care which required Dale and Gary to refrain from making misrepresentations or engaging in other fraudulent conduct relative to Kirlins, Inc., its shareholders, and its Directors;

    (d)  The duty to account to Kirlins, Inc., Donald, and D'Kids and its shareholders;

227.    Dale and Gary breached the aforementioned fiduciary duties through one or more of the following:

    (a)  Setting their salaries, bonuses, and compensation without Board of Director approval and without engaging any professional assistance, studies, or relevant objective criteria;

    (b)  Paying themselves excessive salaries, bonuses, and compensation without Board of Director approval particularly in light of their poor performance and the declining value and revenues of Kirlins, Inc;

    (c)  Having Kirlins, Inc. buy their Demand Notes when Kirlins, Inc. needed cash, and thereby both diminishing the value of all shares, but also placing the rights of voting  stock held by Donald and then D'Kids in a secondary position where it was less likely to provide valuable returns to him;

(d)  Reorganizing Kirlins, Inc. without consulting tax professionals, thereby causing Kirlins, Inc. and its shareholders, including D'Kids and Donald, to suffer losses through the lack of tax optimization;

(e)  Exercising nepotism and disregarding a conflict of interest by retaining Brad Kirlin, Dale's son, and Jeff Kennedy, Dale's son-in-law, to manage distinct and respective financial holdings without properly evaluating their experience and/or making an attempt to retain the best financial managers available, and without first receiving Board of Director approval;

(f)  Exercising nepotism and disregarding a conflict of interest by hiring Craig Kirlin, Dale's son, as a store manager, and later as a district manager, without properly evaluating his experience and/or making an attempt to retain the best individual available for the position(s), and without first receiving Board of Director approval;

(g)  Using Kirlins, Inc. revenue to purchase high dollar split dollar life insurance for their personal benefit;

(h)  Dissolving Kirlins Wholesale, Inc. so to avoid paying Plaintiff Donald and sister Barbara expected cash distributions.

(i)  Wasting Kirlins, Inc. resources to purchase, maintain, and operate a corporate jet that was used for Dale and Gary's personal benefit without properly reimbursing the Company for their personal use of the jet;

(j)  Conducting the activities listed above in secret and with deliberate intent to conceal, without disclosure to all Board members of their activities, and without making appropriate resolutions;

(k) Failing to reinvest or diversify or otherwise strategize for the long-term viability of Kirlins, Inc.;

(l) Failing to cultivate all strategic business options or exercising options for the benefit of stockholders; and/or

(m) Refusing to retire, engage professional management, or engage consultants to operate or assist with operating Kirlins, Inc.

228.    The aforementioned breaches caused Kirlins, Inc. to decline in value and deprived the shareholders, including Donald and D'Kids, to have shares worth less than they would have had under proper management, and to be deprived of distributions, bonuses, and compensation.

229.    Cumulatively, as a direct and proximate result of the aforementioned breaches, Donald and/or D'Kids have suffered damages in excess of ten million dollars ($10,000,000.00), exclusive of interest.

230.    The breaches described above were at all times actively concealed from Donald and/or D'Kids, and the self-dealing conduct described above is ongoing and continuous.

231.    The breaches described above were all done with malice and/or with reckless disregard for the rights of Donald and/or D'Kids and the duties owed to them.

WHEREFORE, plaintiffs Donald and D'Kids respectfully pray that this Court enter judgment in their favor, and against defendants Dale and Gary, and award all available relief and damages, including but not limited to:

(a) An accounting of all compensation paid to Dale and Gary while they were Officers and Directors of Kirlins, Inc.;

(b) The imposition of a constructive trust over all assets held by Dale and Gary acquired by compensation wrongfully paid to them and any appreciation or interest earned thereon;

(c) An award of compensatory damages sufficient to compensate Donald and D/Kids for their share of the funds that were wrongfully deprived to them by Dale and Gary with prejudgment interest;

(d) An award of punitive damages sufficient to punish Dale and Gary and to deter them and others from similar conduct;

(e) The removal of Dale and Gary as directors and officers of the Company

(f) The appointment of a conservator to direct the affairs of the Company until such time as plaintiffs are made whole; and,

(g) Such other and further relief as this Court may deem to be just and proper.

**COUNT V**
**UNJUST ENRICHMENT**
**AGAINST DALE KIRLIN AND GARY KIRLIN**

232.     Plaintiffs adopt and incorporate Paragraphs 1-228 of this Complaint as if fully set forth herein.

233.     Dale and Gary's conduct as described more fully above resulted in them unjustly retaining a benefit to the detriment of Donald and D'Kids.

234.     Specifically, Dale and Gary retained benefits through their:

(a) Disguised Dividend transactions;

(b) Excessive salaries, bonuses, and perquisites;

(c) Personal use of the Cessna Citation II;

(d) Disregard of conflicts of interest; and

(e)  Engaging in nepotism.

235.  Dale and Gary retained these benefit unjustly in that, in the course of obtaining and retaining these benefits, they:

(a)  Disregarded conflicts of interest;

(b)  Engaged in nepotism;

(c)  Flouted corporate formalities;

(d)  Hid their activities from the Board of Directors;

(e)  Breached fiduciary duties owed to Donald, D'Kids, and Kirlins, Inc.;

(f)  Engaged in misrepresentations and fraudulent concealment; and

(g)  Engaged in wire fraud and mail fraud.

236.  Dale and Gary's retention of these benefits was to Donald and D'Kids' detriment in that Dale and Gary's conduct has diminished the value of Kirlins, Inc.'s shares and deprived Donald and D'Kids of the value of their shares and interests in Kirlins, Inc.

237.  The aforementioned breaches caused Kirlins, Inc. to decline in value and deprived the shareholders, including Donald and D'Kids, to have shares worth less than they would have had under proper management, and to be deprived of distributions, bonuses, and compensation.

238.  Cumulatively, as a direct and proximate result of the aforementioned breaches, Donald and/or D'Kids have suffered damages in excess of twenty million dollars ($20,000,000.00) exclusive of interest.

239.  Dale and Gary's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

WHEREFORE, plaintiffs Donald and D'Kids respectfully pray that this Court enter judgment in their favor, and against defendants Dale and Gary, and award all available relief and damages, including but not limited to:

(a)  An accounting of all compensation paid to Dale and Gary while they were Officers and Directors of Kirlins, Inc.;

(b)  Imposition of a constructive trust over all assets held by Dale and Gary acquired by compensation wrongfully paid to them and any appreciation or interest earned thereon;

(c)  An award of damages sufficient to compensate Donald and D'Kids for their share of the funds that were wrongfully deprived to them  by Dale and Gary with prejudgment interest;

(d)  An award of punitive damages sufficient to punish Dale and Gary and to deter them and others from similar conduct;

(e)  The removal of Dale and Gary as directors and officers of the Company

(f)  The appointment of a conservator to direct the affairs of the Company until such time as plaintiffs are made whole; and,

(g)  Any such other and further relief as this Court may deem to be just and proper.

**COUNT VI**
**CONVERSION**
**<u>AGAINST DALE KIRLIN AND GARY KIRLIN</u>**

240.    Plaintiffs adopt and incorporate Paragraphs 1-236 of this Complaint as if fully set forth herein.

241.    D'Kids and, by extension, Donald, have a right to dividends, income, and value from Kirlins, Inc. equal to the right enjoyed by Dale and Gary.

242.    Dale and Gary have exercised unauthorized and wrongful control, dominion, or ownership over property that is rightfully D'Kids' and, by extension, Donald, through their:

        (a)  Disguised Dividend transactions;

        (b)  Excessive salaries, bonuses, and perquisites;

        (c)  Dissolution of Kirlins Wholesale, Inc.; and

        (d)  Personal use of the Cessna Citation II.

243.    D'Kids, and by extension Donald, have an absolute and unconditional right to the immediate possession of their property.

244.    D'Kids, through Donald, have demanded possession of this property from Defendants Dale and Gary.

245.    Despite this demand, Dale and Gary have continued to exercise unauthorized control, dominion, or ownership over the property.

246.    Cumulatively, as a direct and proximate result of Dale and Gary's breaches, D'Kids, and by extension Donald, have suffered damages in excess of twenty million dollars ($20,000,000.00), exclusive of interest.

WHEREFORE, plaintiffs Donald and D'Kids respectfully pray that this Court enter judgment in their favor, and against defendants Dale and Gary, and award all available relief and damages, including but not limited to:

        (a)  An accounting of all compensation paid to Dale and Gary while they were Officers and Directors of Kirlins, Inc.;

(b) The imposition of a constructive trust over all assets held by Dale and Gary acquired by compensation wrongfully paid to them and any appreciation or interest earned thereon;

(c) An award of compensatory damages sufficient to compensate Donald and D/Kids for their share of the funds that were wrongfully deprived to them by Dale and Gary with prejudgment interest;

(d) An award of punitive damages sufficient to punish Dale and Gary and to deter them and others from similar conduct;

(e) The removal of Dale and Gary as directors and officers of the Company;

(f) The appointment of a conservator to direct the affairs of the Company until such time as plaintiffs are made whole; and,

(g) Such other and further relief as this Court may deem to be just and proper.

## COUNT VII
## FRAUDULENT CONCEALMENT
## AGAINST ALL DEFENDANTS

247.   Plaintiffs adopt and incorporate Paragraphs 1-243 of this Complaint as if fully set forth herein.

248.   Dale and Gary owed a fiduciary duty to Donald, as a fellow Director of Kirlins, Inc., and D'Kids, as a shareholder of Kirlins, Inc., not to conceal material facts.

249.   Attorney Rapp, the Schmeideskamp Firm, and the Hutmacher Firm owed a fiduciary duty to Donald, as a Director of Kirlins, Inc. and as a client, and D'Kids, as a shareholder of Kirlins, Inc. and as a client, not to conceal material facts.

250.    Despite these duties and other circumstances requiring them to make disclosures, Dale, Gary, Rapp, the Schmeideskamp Firm, and the Hutmacher Firm concealed material facts from Donald and D'Kids, including:

(a)  The existence of conflicts of interest amongst the legal representations;

(b)  The existence of conflicts of interest involving Dale and Gary's doing business with relatives;

(c)  Concealing the fact that purported Demand Notes and bonuses were actually disguised dividends;

(d)  Concealing the fact that Dale and Gary were withdrawing exorbitant compensation as salaries, bonuses, and perquisites; and

(e)  Concealing the fact that Dale and Gary used Kirlins, Inc.'s Cessna Citation II for personal purposes.

251.    Each of the concealed facts listed in the immediately foregoing paragraph are material facts.

252.    Dale, Gary, Rapp, the Schmeideskamp Firm, and the Hutmacher Firm intended to induce in Donald and D'Kids a false belief as to the existence of these material facts.

253.    Donald and D'Kids could not have discovered the truth surrounding these material facts through reasonable inquiry or inspection.

254.    Donald and D'Kids were prevented by Defendants' concealment and subterfuge from making a reasonable inquiry or inspection into the truth surrounding these material facts.

255.    Donald and D'Kids justifiably relied upon Defendants' silence as a representation that these material facts did not exist.

256.    Donald and D'Kids would have acted differently had they been aware of the concealed facts.

257.    But for the fraud and concealment, D'Kids and Donald would have and could have demanded independent tax advice, valuation advice, corporate governance advice, a bidding process for the appointments in money management and health care insurance that were nepotism, and compensation experts for the exorbitant compensations paid to Dale and Gary.

258.    Donald and D'Kids suffered damages as a result of their reliance on Defendants' silence as a representation that these material facts did not exist. Specifically, Donald and D'Kids were deprived of the opportunity to take corrective action and avoid the tremendous loss of value in Kirlins, Inc. caused by Defendants.

WHEREFORE, plaintiffs Donald and D'Kids respectfully pray that this Court enter judgment in their favor, and against defendants Dale and Gary, and award all available relief and damages, including but not limited to:

(a)  An accounting of all compensation paid to Dale and Gary while they were Officers and Directors of Kirlins, Inc.;

(b)  The imposition of a constructive trust over all assets held by Dale and Gary acquired by compensation wrongfully paid to them and any appreciation or interest earned thereon;

(c)  An award of compensatory damages sufficient to compensate Donald and D/Kids for their share of the funds that were wrongfully deprived to them by Dale and Gary with prejudgment interest;

(d)  An award of punitive damages sufficient to punish Dale and Gary and to deter them and others from similar conduct;

(e)  The removal of Dale and Gary as directors and officers of the Company;

(f)  The appointment of a conservator to direct the affairs of the Company until

such time as plaintiffs are made whole; and,

(g)  Such other and further relief as this Court may deem to be just and proper.

**COUNT VIII**
**EQUITABLE ACCOUNTING**
**AGAINST DALE AND GARY KIRLIN**

259.   Plaintiffs adopt and incorporate Paragraphs 1-255 of this Complaint as if fully set forth herein.

260.   Despite efforts undertaken by Donald and D'Kids, Plaintiffs have been unable to determine the true value of:

(a)  Demand Note values and payments;

(b)  Salaries, bonuses, and perquisites paid to Dale and Gary;

(c)  "Disguised Dividends" paid to Dale and Gary;

(d)  Dale and Gary's private use of the Cessna Citation II owned by Kirlins, Inc. and the value of the associated reimbursement owed to Kirlins, Inc.;

(e)  The additional cost of transferring the management of Kirlins, Inc.'s retirement account to Dale's son, Bradford, and the amount owed to Kirlins, Inc. as reimbursement; and

(f)  The additional cost of transferring the management of Kirlins, Inc.'s health insurance plan to Dale's son-in-law, Jeffrey, and the amount owed to Kirlins, Inc. as reimbursement;

261.   Donald and D'Kids for information related to the financial condition of Kirlins, Inc.

262.     Dale and Gary have refused to provide even basic information related to the financial condition of Kirlins, Inc.

263.     The information needed to ascertain the value is not in the possession of Donald, but is in the possession of Dale, Gary and the Company.

264.     Dale and Gary have engaged, and continue to engage, in breaches of their fiduciary duties and tortious behavior, which has negatively impacted the value of Kirlins, Inc.

265.     There is no adequate remedy at law that will allow for a determination of the actual value of Kirlins, Inc. shares and the damage to Kirlins, Inc. caused by Dale and Gary.

266.     The accounts between the parties, including between Plaintiffs and Defendants and between Defendants and Kirlins, Inc., are of such a complicated nature that only a court of equity can satisfactorily unravel them.

WHEREFORE, Plaintiff Donald respectfully prays that this Court enter judgment in his favor individually and derivatively on behalf of Kirlins, Inc., and against defendants Dale and Gary, and award:

(a)     An order granting Donald and D'Kids an accounting of all financials of Kirlins, Inc.

(b)     Compensatory damages in an amount to be proven at trial;

(c)     An award of attorney's fees and expenses incurred in bringing this action; and

(d)     Any such other and further relief to which Donald may be entitled.

**COUNT IX**
**CONSTRUCTIVE TRUST**
**AGAINST DALE KIRLIN AND GARY KIRLIN**

267.    Plaintiffs adopt and incorporate Paragraphs 1-263 of this Complaint as if fully set forth herein.

268.    Dale and Gary are in possession of property to which Donald, D'Kids, and/or Kirlins, Inc. has a right.

269.    Dale and Gary obtained possession of the property by abusing their fiduciary relationship with Donald, D'Kids, and/or Kirlins, Inc.

270.    Dale and Gary would be unjustly enriched if they are permitted to retain that property.

WHEREFORE, Plaintiffs Donald and D'Kids respectfully pray that this Court enter judgment in their favor individually and derivatively on behalf of Kirlins, Inc., and against defendants Dale and Gary, and award:

(a)     An order declaring Dale and Gary constructive trustees of the property in question;

(b)     An order compelling Dale and Gary to transfer the property in question to D'Kids and Donald.

(c)     Compensatory damages in an amount to be proven at trial;

(d)     An award of attorney's fees and expenses incurred in bringing this action; and

(e)     Any such other and further relief to which Donald and/or D'Kids may be entitled.

**COUNT X**
**INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**AGAINST ALL DEFENDANTS**

271.    Plaintiffs adopt and incorporate Paragraphs 1-267 of this Complaint as if fully set forth herein.

272.    Donald established D'Kids for the primary purpose of holding his shared in Kirlins, Inc. for his benefit and for the benefit of his family.

273.    Donald has a reasonable expectation that he and his family would benefit financially from D'Kids and from the revenues generated by D'Kids' shares in Kirlins, Inc.

274.    Dale, Gary, attorney Rapp, the Schmeideskamp Firm, and the Hutmacher Firm knew of Donald's relationship with D'Kids, and knew of Donald's expectation that his relationship with D'Kids would result in economic advantage.

275.    Dale, Gary, attorney Rapp, the Schmeideskamp Firm, and the Hutmacher Firm intentionally interfered with Dale's relationship with D'Kids through their breaches of fiduciary duties, mismanagement, and concealment.

276.    Dale, Gary, attorney Rapp, the Schmeideskamp Firm, and the Hutmacher Firm's intentional interference damaged Donald's reasonable expectation that he and his family would benefit financially from D'Kids and from revenues generated by D'Kids' shares in Kirlins, Inc.

277.    Donald has suffered damages as a result of the disruption to his expectancy of economic advantage in an amount in excess of $20 million exclusive of interest.

WHEREFORE, Plaintiff Donald respectfully prays that this Court enter judgment in his favor individually and derivatively on behalf of Kirlins, Inc., and against defendants Dale and Gary, and award:

(a)    An order granting Donald and D'Kids an accounting of all financials of Kirlins, Inc.

(b)    Compensatory damages in an amount to be proven at trial;

(c)     An award of attorney's fees and expenses incurred in bringing this action;

(d)     The removal of Dale and Gary as directors and officers of the Company;

(e)     The appointment of a conservator to direct the affairs of the Company until such time as plaintiffs are made whole; and,

(f)     Any such other and further relief to which Donald may be entitled.

## COUNT XI
## LEGAL MALPRACTICE
## AGAINST RAPP, THE SCHMEIDESKAMP FIRM, AND THE HUTMACHER FIRM

278.    Plaintiffs adopt and incorporate Paragraphs 1-274 of this Complaint as if fully set forth herein.

279.    An attorney-client relationship existed between Donald and Rapp.

280.    An attorney-client relationship existed between Donald and the Schmeideskamp Firm.

281.    An attorney-client relationship existed between Donald and the Hutmacher Firm.

282.    An attorney-client relationship existed between D'Kids and Rapp.

283.    An attorney-client relationship existed between D'Kids and the Schmeideskamp Firm.

284.    An attorney-client relationship existed between D'Kids and the Hutmacher Firm.

285.    Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm negligently breached these attorney-client relationships in the following ways:

(a)     Undertaking representation of Donald and/or D'Kids despite the existence of a conflict of interest;

(b)     Failing to recognize conflicts of interest;

(c)     Failing to have in place reasonable measures designed to prevent undertaking

48

conflicting representations;

(d)     Showing preferential treatment to Dale and Gary to the detriment of their

representation of Donald and D'Kids;

(e)     Withholding material information from Donald and D'Kids relative to Dale and

Gary's actions and the condition of Kirlins, Inc.;

(f)     Failing to properly advise Donald and D'Kids that their interests were being

shortchanged and converted;

(g)     Violating the duty of loyalty they owed to Donald and D'Kids to represent their

interests first and to warn them of actions that were materially contrary to their

interests;

(h)     Violating the duty of loyalty to Donald and D'Kids by not advising them of

corrective action or remediation, but instead remained silent and concealed the

financial machinations and conflicts of interest that have ravaged the value of

Kirlins, Inc. to the great detriment of Donald and D'Kids;

(i)     In 2007, drafting Stock Purchase Agreements for all shareholders,

including Plaintiffs Donald and D'Kids and Defendants Dale and Gary, without

advising Plaintiffs of the potential benefits and detriments of signing the

Agreements;

(j)     In October and November 2007, favoring the position taken by Defendants Gary

and Dale over the position taken by Donald with respect to the Stock Purchase

Agreements, and attempting to pressure Donald to sign the Agreements;

(k)     Drafting an Agreement Regarding Kirlins, Inc., which prioritized the interests of

Gary and Dale over the interests of Donald and D'Kids, but failed to advise

Donald of the legal consequences of the Agreement;

(l)    When asked by Donald to include in the October 2009 corporate minutes that

board approval would be required for any new Kirlins, Inc. loans, attempting to

trick Donald with watered-down language and then ultimately siding with

Defendants Gary and Dale and refusing to add the language;

(m)    Despite the multiple conflicts of interest and despite taking positions contrary to

the interests of Plaintiffs Donald and D'Kids, continuing, though November 2014,

to represent Plaintiff Donald, his business interests apart from Kirlins, and

D'Kids, without advising of the conflict of interest and, in fact, using information

gained from these representations against Donald and D'Kids in Kirlins, Inc.

dealings; and

(n)    As recently as December 8, 2015, after being directed to cease communications

with Plaintiffs Donald and D'Kids, attempting to continue to exert undue and

improper influence over Plaintiffs Donald and D'Kids by insisting that further

communications were necessary relative to other of Donald's business interests;

and

(o)    Otherwise breaching their duties under the Illinois Rules of Professional Conduct

to Donald and D'Kids.

286.    The breaches of Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm

have occurred over a period of years, the most recent of which occurred in November 2015.

287.    The last date on which Rapp performed legal work purportedly on behalf of

Donald and D'Kids was in November 2015.

288.    The years-long representation of Donald and D'Kids by Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm was a continuous course of negligence, the cumulative result of which caused injury to Donald and D'Kids and caused Donald and D'Kids to suffer damages.

289.    At the time of Defendants' breaches, their attorney-client relationship with Plaintiffs was clearly established in that it had continued for more than 10 years, Defendants had advised Plaintiffs on numerous transactional matters, Defendants issued dozens of invoices for legal services to Plaintiffs, and Plaintiffs paid those invoices for legal services.

290.    Despite their duty to disclose the existence of a potential cause of action to Donald and D'Kids, Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm remained silent about Donald and D'Kids potential cause of action against the Defendant attorneys and against Dale and Gary.

291.    Donald and D'Kids trusted Rapp, the Schmeideskamp Firm, and the Hutmacher Firm, and were lulled into a false sense of security by the attorneys.

292.    As a result of the trust Donald and D'Kids placed in Rapp, the Schmeideskamp Firm, and the Hutmacher Firm, Donald and D'Kids did not investigate the corporate governance of Kirlins, Inc., and did not discover their cause of action until November 2015.

293.    As a direct and proximate result of the conduct of Rapp, the Schmeideskamp Firm, and the Hutmacher Firm, Donald and D'Kids have suffered damages in an amount in excess of $20 million exclusive of interest.

294.    Donald and D'Kids did not learn of the injuries and damages they suffered as a result of the misconduct of Rapp, the Hutmacher Firm, and the Schmeideskamp Firm until Donald and D'Kids consulted other counsel in November 2015.

51

295.     Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm continuously represented to Donald and D'Kids that there was no misconduct occurring within Kirlins, Inc.

296.     Through their silence, Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm misrepresented to Donald and D'Kids that Donald and D'Kids had no viable cause of action for the misconduct occurring within Kirlins, Inc.

297.     Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm misrepresented and concealed material facts relative to their wrongdoing, the wrongdoing of Dale and Gary, and the existence of this cause of action.

298.     At the time Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm misrepresented and/or concealed the material facts relative to their wrongdoing, the wrongdoing of Dale and Gary, and the existence of this cause of action, Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm knew the representations were untrue and concealed facts deceptive.

299.     Donald and D'Kids did not know that Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm's misrepresentations or deceptive concealment were untrue until Donald and D'Kids investigated the corporate governance of Kirlins, Inc., which delayed filing suit.

300.     Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm intended or reasonably expected that Donald and D'Kids would decide whether to investigate the corporate governance of Kirlins, Inc. or file suit based on the attorneys' misrepresentations.

301.     Donald and D'Kids relied on the misrepresentations of Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm to their detriment.

302.     Donald and D'Kids would be prejudiced by their reliance on the attorneys' misrepresentations if Rapp, the Schmeideskamp Firm, and/or the Hutmacher Firm were permitted to deny their representations.

303.    Beginning in November 2015, and continuing to the present time and foreseeable future, Donald and D'Kids have incurred attorneys' fees, the need for which is directly attributable to the misconduct of Rapp, the Hutmacher Firm, and the Schmeideskamp Firm.

WHEREFORE, Plaintiff Donald respectfully prays that this Court enter judgment in his favor individually and derivatively on behalf of Kirlins, Inc., and against defendants Dale and Gary, and award:

(a)    Compensatory damages in an amount to be proven at trial;

(b)    An award of attorney's fees and expenses incurred in bringing this action; and

(c)    Any such other and further relief to which Donald may be entitled.

Respectfully submitted,

D'KIDS PARTNERS, LP and DONALD W. KIRLIN

By:____/s/ Alan L. Farkas_____
One of Their Attorneys

Alan L. Farkas
afarkas@salawus.com
Illinois State Bar #6216036
Eric Fogel
efogel@salawus.com
Illinois State Bar #6194808
Michael S. McGrory
mmcgrory@salawus.com
Illinois State Bar #6280591
SmithAmundsen, LLC
150 North Michigan Ave., Suite 3300
Chicago, IL 60601
(312) 894-3200, phone
(312) 894-3210, fax